Filed 3/20/25  P. v. Wolke CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>FRANCIS WOLKE,<br><br>        Defendant and Appellant. | A168305<br><br>(San Mateo County<br> Super. Ct. No. 18SF014568A) |

A jury found Francis Wolke guilty of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a)) for killing Kathleen Anderson and found true two deadly weapon allegations.  In a separate phase of trial, the jury found Wolke was legally sane when he committed the murder.

Wolke appeals, challenging only the sanity finding.  He argues the trial court should have excluded as unreliable the testimony of one of the People's experts, a forensic psychologist.  The psychologist's medical license was in a probationary status when he evaluated Wolke because of a misdemeanor conviction for driving under the influence of alcohol, and before the trial the psychologist surrendered his license and retired after testing positive for alcohol in violation of the terms of his probationary license.  Wolke further argues that even if this psychologist's testimony was properly admitted,

_____

[1] Undesignated statutory references are to the Penal Code.

substantial evidence does not support the jury's finding of sanity. We find no error and affirm.

## I. BACKGROUND

Wolke was charged with murdering Anderson, as well as special allegations that he inflicted great bodily injury and used two deadly weapons, a pen and a hand saw. He initially pleaded not guilty and later pleaded not guilty by reason of insanity. Because Wolke challenges only the jury's sanity finding at his trial, not its verdict of guilt, we mention only those facts that bear on the question of Wolke's sanity.

### A. *Guilt phase*

#### 1. Prosecution case

Around 5:30 p.m. one day in December 2018, Daniel B. went to Anderson's house in Menlo Park because he was worried about her. Unusually, Anderson had not shown up to work that morning, and her garbage cans were still out at the curb. Daniel B. went into Anderson's home and saw Wolke coming out of a bedroom at the top of the stairs, looking disheveled. Daniel asked, "Where is Kathy?" Wolke said he had killed her and she was in the basement. Wolke was calm and matter of fact. Daniel B. asked if Anderson was still alive, and Wolke said, "No. I killed her a long time ago." Wolke also said, "I'm a bad man. I'm a bad person. I'm going to jail."

When the police arrived, Wolke volunteered, "The body is in the basement. I have a mental problem. I very seriously killed this woman." Wolke's demeanor was devoid of emotion. Wolke was very calm and stoic on the way to the police station, and he did not talk to anyone or anything that was not there. At the station he appeared to understand the officers' instructions, was cooperative, and did not talk to himself. Wolke tested

2

negative for marijuana and various other substances, including methamphetamine and cocaine metabolite.

There were signs of a struggle in one of the upstairs bedrooms. Police found Anderson's body in her pajamas in the basement with a major wound on the back of her neck and a hand saw next to her body. From the major amount of partially coagulated blood surrounding Anderson's body, she appeared to have been dead for some time.

Anderson's body showed injuries consistent with having been dragged. A pen had been jammed through her left eye and through her brain, and both of her eyeballs had collapsed. Anderson was likely still conscious for some period of time after the pen was put into her eye. She appeared to have been partially beheaded, with the neck wound showing tool marks consistent with a saw. The quantity of blood around Anderson's body suggested she had still been alive when she was partially beheaded, but the relative lack of blood in her lungs suggested she had not been breathing. She had a broken hyoid bone in her neck, consistent with strangulation or blunt force to her neck.

According to documents found in Anderson's home, during the week preceding Anderson's murder Wolke traveled by bus from Cincinnati to San Francisco via Chicago.

### 2. Defense

#### a. *Wolke's history before the offense*

Wolke's family had a history of mental illness, including his father having experienced a psychotic break and two maternal uncles having schizophrenia. In high school in Cincinnati, Wolke began using marijuana and cocaine and mentioned hearing command auditory hallucinations. In college, Wolke said he used marijuana, mushrooms, and LSD and would send text messages that did not quite make sense. Around 2010 or 2011, Wolke

3

dropped out of college and moved to California, saying he would get rich as a computer programmer. He was obsessed with getting rich.

Wolke called himself "Gabriel Lidell" when he met Dan G. in California in 2014. Apart from a six-month period when he lived with Dan. G., Wolke was homeless. Wolke would occasionally stay with friends and at other times would sleep during the day on hammocks in people's front yards or at cafes and then work all night using the cafes' Wi-Fi. Wolke spent all of his time working on creating a computer operating system. Wolke exhibited paranoia, such as the belief that the people who created the Microsoft operating system would see him as a threat and try to kill him.

Wolke used methamphetamine and large amounts of coffee simultaneously so he could stay more focused and work for several days at a time. Wolke never told Dan G. about having any auditory hallucinations, and Dan G. never saw Wolke appearing to talk to someone who was not in the room. At one point while staying temporarily at Dan G.'s co-op, Wolke used methamphetamine, did not sleep for four or five days, and went into methamphetamine-induced psychosis. Wolke then broke items and wrote on the walls in two rooms in the house.

Wolke was hospitalized five times with manic and psychotic symptoms between July 2016 and December 2017. He tested positive for methamphetamine at most hospitalizations, and his thoughts were often disorganized. On multiple occasions he was combative and required restraint, sedation, or antipsychotic medication. Two of the hospitalizations were also necessary because he suffered injuries after jumping or falling out of windows or off buildings on the Stanford University campus.

Wolke called his parents from a psychiatric ward in December 2017 and said he wanted to move back home and get a job. The psychiatric ward

4

gave him the antipsychotic medication Risperdal and told him to continue with psychiatric services.

While at home in 2018, Wolke's parents took him to two different mental health professionals, and he had seven sessions in total. Wolke denied being mentally ill and refused to take any medication. He made odd statements and exhibited paranoia. Wolke once told his siblings, "I could kill you all." When asked to explain, he said simply, "I know what is going to happen." At another one point, he walked into his sister's bedroom in the middle of the night and told her, "[D]on't trust you. Don't trust anyone. Don't trust mom and dad. And don't trust yourself." But Wolke did not say anything at that time about hearing voices, command auditory hallucinations, or seeing things that were not there, and he never appeared to be talking to someone who was not there.

Eventually, in December 2018, Wolke e-mailed his parents and said he had left his bike at the Greyhound station, where he had evidently ridden from the family house.

### b. The offense

Wolke presented testimony from a forensic psychiatrist, Dr. Jeffrey Gould. According to statements Wolke made to Gould, Wolke set out for California in 2018 because auditory hallucinations were telling him to come join the economic one percent. Wolke took a bus to Chicago and then asked a friend for money to complete the journey. The voices told him not to eat some cookies that he had bought with the last of his money. But Wolke did eat the cookies.

After Wolke got to Menlo Park, the voices told him to "sin," which Wolke understood to mean stealing food. He went into a house at random to look for food. He was unaware of anyone in the house. He claimed he ate

some cannabis gummies in the house, even though he tested negative for marijuana after the offense.  He left for two minutes and walked around the house and to the corner.

Wolke then returned to the house and went to the upstairs bedroom.  He encountered Anderson.  Wolke remembered the voices telling him " '[n]ot to bitch out, not to back out, to just do it,' " and " 'to join up.' "  Wolke said this meant that if he killed Anderson, it would help him join the one percent and perhaps stay young.  Wolke never expressed any fear about what might happen if he did not follow the command.  He also said, "I wasn't thinking.  I wasn't feeling.  I was just doing."

Wolke strangled Anderson for a few seconds and stabbed her in the eye with a pen.  Wolke said he thought that other people would approve of him killing Anderson and becoming part of the one percent because he thought the one percent was stealing from people, killing people, and eating people and their stem cells to stay young for a long time.  Wolke said he thought it was the right thing to do because of his belief.  Wolke thought Anderson died immediately after he stabbed her in the eye.  Wolke admitted dragging Anderson's body downstairs but did not know why he did that.  He estimated he was in the house for another 10 minutes before Daniel B. arrived.

After Wolke killed Anderson, the voices were distressed, asking him whether he just killed a person at random.  He then was distressed at having just killed someone randomly.  The voices ended 15 minutes after the killing.

In the jail, Wolke initially denied having mental health issues or history, and for the first two weeks there were no signs of mental illness, although he did have a flat affect.  Later he said he had auditory hallucinations, and that people were going to hurt him.  While in the jail, Wolke twice jumped off a second story balcony.  Wolke broke his arm

thrashing in handcuffs while jail staff were trying to get X-rays. Wolke said he saw visual hallucinations of dogs on the wall and meth pipes. He said he wanted to kill himself to stop his parents from interlinking their toes and dancing. On another occasion, Wolke said he jumped in order to be released from the jail so he could kill the venture capitalist Tim Draper, whom Wolke said was in charge of bail. Wolke also thought people were coming to kill him.

Jail staff prescribed him Risperdal, which typically takes four to 12 weeks to take effect. Wolke continued to report visual and auditory hallucinations and suicidal ideation. But by April 2019, Wolke's psychotic symptoms were subsiding.

### c.    Dr. Jeffrey Gould's opinion

Dr. Gould interviewed Wolke in January 2019 and October 2020. He also reviewed records from the four other doctors who evaluated Wolke and performed psychological testing.

Dr. Gould's opinion was that at the time of the offense in December 2018, Wolke was experiencing psychotic symptoms due to schizophrenia. Schizophrenia is characterized by (1) delusions, meaning believing something that is not true; (2) hallucinations, usually auditory; (3) disorganization, usually in speech; and (4) negative symptoms, meaning flat speech, little spontaneous thought, or cognitive deficits. Schizophrenia is a long-term illness, beginning in late adolescence or early adulthood and then waxing and waning throughout adulthood. Dr. Gould also diagnosed Wolke as having cannabis and methamphetamine substance use disorders. Amphetamines can produce the same symptoms as schizophrenia, including psychosis. Doctors differentiate between substance-induced psychosis and schizophrenia

7

by looking at whether someone has psychotic symptoms over a prolonged period of time with no or reduced substance use, like Wolke.

Dr. Gould did not detect any malingering, meaning Wolke was not purposefully feigning, faking, or exaggerating his psychiatric symptoms. Dr. Gould thought it reasonable to assume Wolke still had schizophrenia at the time of the offense because it was observed before and afterwards. Dr. Gould acknowledged that Wolke estimated he was in Anderson's house for 10 minutes even though other evidence, such as the fact that Anderson was found in her pajamas at 5:30 p.m. and had not been to work or returned her garbage cans to the back of her house, indicated it was longer. Dr. Gould said such an inability to assess the passage of time could be consistent with psychosis. People's memories of psychotic episodes can vary, with some people remembering nothing and others having total recall. As someone's psychotic symptoms reduce, sometimes they gain perspective on their symptoms and can report them better, as Wolke did when describing his mental health issues after beginning medication in jail.

### 3. Prosecution Rebuttal

Wolke told a private defender investigator in May 2019 that the voices were friendly and instructive, not threatening, demanding, or confrontational. The voices told him he needed to "sin" to join the one percent and continue living but did not tell him to commit murder as a sin. Wolke told the investigator that if he had found a couple or a single man in the bed when he went upstairs, he would have said he was robbing the house and pleaded not to be arrested. Wolke would not have attacked a single man because he could not have easily overpowered him.

Dr. Jeremy Coles, a clinical and forensic psychologist, interviewed Wolke in October 2021 and reviewed the psychological evaluations made by

other experts. Dr. Coles diagnosed Wolke with other unspecified psychotic disorder, which is a psychotic disorder in the same family as schizophrenia.

According to his statements to Dr. Coles, between leaving Cincinnati and arriving in Menlo Park, Wolke ate only a bag of cookies, a Snickers bar, and some candy. Wolke looked for an empty house in Menlo Park to steal food from, so that he would not get caught and go to jail. Wolke did not hear voices continuously; the voices told him to steal food, then there was a period of no voices, and then he heard the voices again after encountering Anderson. Wolke never told Dr. Coles that the voices told him to kill her, but he did say that he understood he was there to join the one percent and that killing her would help him join the one percent. He believed the one percent would eat Anderson's body or harvest the stem cells to remain young.

## B.  Sanity Phase

The jury found Wolke guilty of first degree murder and found true the special allegations that he used deadly weapons in the commission of the crime. (§§ 187, subd. (a), 189, subd. (a), 12022, subd. (b)(1).) The trial then moved to a second phase to determine whether Wolke was legally insane at the time of the offense. The parties stipulated that evidence from the guilt phase was applicable in the sanity phase.

### 1.  Wolke's witnesses

Wolke called two witnesses in the sanity phase, Drs. David Berke and Jeffrey Kline.

#### a.  Dr. David Berke

Dr. Berke was a forensic psychologist appointed by the court to evaluate Wolke. He interviewed Wolke and reviewed the other experts' evaluations of Wolke.

9

Dr. Berke diagnosed Wolke as schizophrenic with polysubstance abuse for marijuana and methamphetamine. Dr. Berke concluded that Wolke was responding to command auditory hallucinations when he killed Anderson, which suggested that he did not fully appreciate the nature and quality of his act. Dr. Berke also concluded that there was strong evidence that Wolke did not appreciate the wrongfulness of his acts. Dr. Berke pointed out Wolke's delusion that the one percent would approve of the killing because the one percent kill people and eat their stem cells to gain eternal youth. Dr. Berke noted that Wolke believed Anderson was dead after the stabbing, and Dr. Berke concluded it defied logic and reason to then take her body to the basement and try to decapitate her. Even if Anderson was still alive at the time, Dr. Berke found the attempted decapitation was at least "overkill" and psychotic behavior. From Wolke's statements, Dr. Berke concluded that Wolke had a moment of clarity when he was in the basement and realized what he had done. But it was just a moment, and his subsequent actions in the basement appeared to reflect that he did not appreciate the wrongfulness of his behavior.

On cross-examination, Dr. Berke admitted he follows a template for his reports and that his report about Wolke had several inaccuracies, including referring to Wolke with someone else's name and misstating his birth date. The report stated that Wolke had been using methamphetamine for a month before the offense, which Dr. Berke admitted was incorrect. His report also said that Wolke refused to seek mental health help in Ohio. Dr. Berke said he was unaware of the fact that Wolke saw two different mental health professionals for a total of seven times. The report said that Wolke's symptoms were flagrant when he returned home in 2018, but Dr. Berke agreed that Wolke's psychiatric stability was better in 2018 than in 2016 and

2017.  Dr. Berke said in his report that Wolke's behavior in Anderson's home was paranoid, but he conceded that there was no evidence of that.  Dr. Berke maintained that Wolke had told him that the voices instructed him to kill Anderson, but Dr. Berke acknowledged that Wolke specifically told other investigators and doctors that the voices only said to " 'join up' " and never said to kill Anderson.

Dr. Berke acknowledged that Wolke said repeatedly that he first entered Anderson's home to "steal" food, and he agreed that the use of "steal" indicated that Wolke was going to commit a criminal act.  Dr. Berke agreed that someone can be delusional, experience auditory hallucinations, or serious psychosis and still appreciate legal and moral right and wrong.

### b.    Dr. Jeffrey Kline

Dr. Kline, a clinical and forensic psychologist, interviewed Wolke and administered psychological tests in April 2019, September 2019, and November 2020.  He also reviewed the evaluations of Drs. Gould, Berke, Wilkinson, and Coles.  Dr. Kline's tests indicated, among other things, that Wolke was not faking or exaggerating symptoms of mental illness.

Dr. Kline believed that Wolke understood the nature of his act and its consequences.  But he concluded that Wolke did not understand the wrongfulness of his action when he killed Anderson because of his psychosis. He based this opinion on Wolke's delusions and auditory hallucinations that he needed to kill Anderson to join the one percent.  Dr. Kline concluded Wolke was psychotic at the time because he reported being in the house for only 10 or 15 minutes, when other evidence indicated he was there for hours. Dr. Kline believed Wolke did not have the cognitive wherewithal, because of his psychosis, to think about whether other people would think his actions were wrong or whether he thought they were wrong but justified anyway.

11

On cross-examination, Dr. Kline acknowledged that Wolke said he heard voices promising him benefits if he did not eat some cookies, but he ate the cookies anyway. Dr. Kline conceded that Wolke never said the voices specifically told him to kill Anderson or that he had any sort of fear. But Dr. Kline also said that Wolke said he did not "sin" in the basement with Anderson. Wolke never said expressly that he believed his actions were right or imminently necessary; Dr. Kline inferred those beliefs from Wolke's mental health state. Dr. Kline was aware that Wolke had said, in the interview with the private defender investigator 11 months after the killing, that if he had found a man or a couple in the bedroom instead of Anderson he would not have attacked. Dr. Kline did not consider this statement relevant because it was a hypothetical response long after the offense, and he directly addressed the members of the jury and told them not to consider it. According to Dr. Kline, hypotheticals are not a recommended way to evaluate a defendant about their mental state at the time of an offense.

### 2. Prosecution witnesses

#### a. Dr. George Wilkinson

Dr. George Wilkinson was a forensic psychiatrist from 1974 to the end of 2021. In September 2016, he was arrested for misdemeanor driving under the influence and a hit and run involving a telephone pole. He pleaded no contest in San Mateo County to violating Vehicle Code section 23152, subdivision (b), which is driving with a blood alcohol level of 0.08 percent or higher. His blood alcohol was over 0.20 percent. He was placed on misdemeanor criminal probation for three years, and his case was later expunged in July 2021.

As a result of Dr. Wilkinson's criminal case, in a May 2019 stipulated disciplinary order the Medical Board of California (Medical Board) revoked

his medical license, with the revocation stayed during a three-year probationary period.[2] One of the conditions of his probationary medical license was that he abstain from alcohol. A second condition required him to give the Medical Board the contact information of his employers and supervisors and consent for the Medical Board to communicate with them. A third condition was that he give a copy of the stipulated disciplinary order to leadership at "every hospital where privileges or membership are extended to [him], at any other facility where [he] engages in the practice of medicine," and to his malpractice insurance carriers. In July 2021, he violated his probation conditions by testing positive for the consumption of alcohol. In September 2021, the Medical Board filed a petition to revoke his probation. He agreed to surrender his medical license and retire as of December 31, 2021.

Dr. Wilkinson was appointed by the trial court in November 2020 to evaluate whether Wolke was legally sane when he committed the offense, meaning whether he was incapable of knowing or understanding the nature and quality of his act or of distinguishing right from wrong at the time of the commission of the offense. Dr. Wilkinson was still on criminal probation and probation with the Medical Board when he was appointed and when he evaluated Wolke. Dr. Wilkinson did not notify the court of his probationary license. Dr. Wilkinson reviewed additional records relating to other experts' evaluations of Wolke after his December 2021 retirement and surrender of his license.

---

[2] We take judicial notice of the Medical Board's stipulated disciplinary order, which the trial court also considered. (Evid. Code, § 452, subd. (c) [judicial notice may be taken of official acts of executive department of any state].)

13

The prosecution moved in limine to exclude evidence regarding Dr. Wilkinson's medical license. Wolke cross-moved to exclude Dr. Wilkinson's testimony based on his violations of the terms of his Medical Board probation. The trial court ruled that Dr. Wilkinson could testify about his evaluation of Wolke, since he was licensed when he performed the evaluation. The court excluded any evidence related to Dr. Wilkinson's follow-up review of other experts' evaluations because that follow-up review took place after Dr. Wilkinson had surrendered his medical license. The trial court allowed Wolke to cross-examine Dr. Wilkinson about his conviction and probationary license. But it precluded Wolke from questioning Dr. Wilkinson about his failure to notify the court of his probationary license, finding that the disciplinary order did not require such notice.

At trial, Dr. Wilkinson testified that he interpreted the distinction between right and wrong in the sanity standard given to him by the court as including moral wrong and/or legal wrong. Dr. Wilkinson conducted interviews and psychological testing of Wolke in January and February 2021. Wolke was taking an average dose of Prozac and a substantial dose of Risperdal at the time.

Like Drs. Berke and Kline, Dr. Wilkinson said that Wolke told him his voices told him to "go and steal." The voices urged him to join the one percent, so he killed Anderson to join the one percent and become wealthy. Dr. Wilkinson found it strange that Wolke was clear about going to Anderson's bedroom and killing her but said he did not remember why he took her to the basement. Dr. Wilkinson believed Wolke was editing his account of the basement because it was too embarrassing for him for some reason. It did not seem to Dr. Wilkinson that psychosis made Wolke's

memory incomplete because his primary symptoms of psychosis were delusions and auditory hallucinations, not confusion or delirium.

Dr. Wilkinson diagnosed Wolke with schizoaffective schizophrenia, which is a major depressive disorder with psychotic symptoms. Dr. Wilkinson was confident that Wolke was in all likelihood psychotic at the time of the offense, but he concluded that Wolke was legally sane at that time.

Dr. Wilkinson believed that Wolke was aware of the nature and quality of his act, since that understanding was necessary to fulfill the delusions. Regarding legal wrongfulness, Wolke told Dr. Wilkinson that he understood what he had done was wrong and against the law. To get at the question of moral wrongfulness, Dr. Wilkinson asked whether Wolke's neighbors or friends thought it was right to murder people. Wolke said that everyone would think it was wrong, but he added that at the time, he just did not think about that. Wolke then added that he did not think it was wrong because so many powerful people were committing murder and consuming human flesh. Dr. Wilkinson construed the latter statement as a justification for committing the act despite appreciating its wrongfulness.

Wolke did not suggest that he was afraid of the voices or overwhelmed by the experience of hearing them. According to Dr. Wilkinson, most of the time when a person is driven by psychosis to commit murder, he or she does so altruistically, to save the world or kill Satan, or under a threat, to prevent the demonic voices from killing him or her or a loved one. The fact that Wolke committed the murder for his personal gain, to gain wealth, made this case unusual.

On cross-examination, Dr. Wilkinson admitted that his report did not include his opinion that Wolke was editing his story about taking Anderson

15

to the basement. He characterized that opinion as a clinical speculation that did not have strong enough data to include in the report. But his report did note the inconsistency between Wolke's failure to recall the basement and his clear memories of many other facts and his hallucinations and delusions at the time. Dr. Wilkinson also said that a lack of memory is consistent with someone who has had a psychotic break and cannot remember all of it.

### b. Dr. Jeremy Coles

Finally, the prosecution re-called Dr. Coles. Dr. Coles asked Wolke about some of the things Dr. Berke reported, such as the statement that Wolke had been using methamphetamine for a month before the offense. Wolke said he told Dr. Berke he had not used methamphetamine for a year prior to the offense. Wolke told Dr. Coles that he had a lot of misunderstandings with Dr. Berke and believed Dr. Berke might have a hearing problem.

Dr. Coles testified that psychosis does not preclude an understanding of right and wrong. He concluded that Wolke had a rational thought process and understood the legal consequence of stealing based on Wolke's statements that he picked Anderson's house because it looked like no one was home. It was important to Wolke to go to an unoccupied house because if he was going to "steal" food, it was essential that nobody be there so he would not get in trouble and go to jail.

Wolke confirmed to Dr. Coles his prior statement to the private defender investigator about not attacking if he had found a man or a couple in Anderson's bedroom. This statement indicated to Dr. Coles that Wolke's decisionmaking process was based on rationality and his understanding of whether he could dispose of Anderson as a witness. Dr. Coles disagreed with Dr. Kline's statement that one should not consider Wolke's statement about

16

this hypothetical. Dr. Coles thought that hypotheticals often illuminate thought processes.

Dr. Coles had treated people who felt overwhelmed by nonstop auditory hallucinations and who took a certain action to stop the voices or because the voices threatened a negative consequence. Wolke never reported hearing voices nonstop from Cincinnati to Menlo Park, and he did not hear voices between entering the house and the moment before he killed Anderson.

Dr. Coles believed that Wolke had a mental disease or defect. But Dr. Coles's opinion was that Wolke was legally sane at the time of the offense. He believed Wolke knew he was killing someone with a pen and a saw, as opposed to having a hallucination that Anderson was not a person. Dr. Coles believed Wolke knew that killing Anderson was legally wrong, based on understanding that stealing was wrong and his statement that he would have pleaded with a man or couple not to have him arrested. Dr. Coles believed Wolke knew that killing Anderson was morally wrong because he was not experiencing any command hallucinations compelling him to commit the act and overriding his legal concern with getting caught. Dr. Coles also noted that the hallucination that the one percent was killing people to stay young was "not actually all that moral."

On cross-examination, Dr. Coles agreed that about three minutes passed between when Wolke entered the house and the moment before he killed Anderson.

The jury found Wolke was legally sane. The trial court sentenced him to 25 years to life in prison for the first degree murder conviction. The trial court imposed one additional year for one allegation of use of a deadly weapon and stayed the one-year punishment for the other allegation, for a

total of 26 years to life in prison.  It found true the allegation that Wolke caused great bodily injury.

## II.  DISCUSSION

### A.  *Overview of Sanity Trial Procedures*

"Under California law, if a defendant pleads not guilty and joins it with a plea of not guilty by reason of insanity, the issues of guilt and sanity are tried separately.  Penal Code section 1026, subdivision (a), provides that in such circumstances, 'the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed.  If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court.  In that trial, the jury shall return a verdict either that the defendant was sane at the time the offense was committed or was insane at the time the offense was committed.' " (*People v. Hernandez* (2000) 22 Cal.4th 512, 520.)  "The 'sanity trial is but a part of the same criminal proceeding as the guilt phase' [citation] but differs procedurally from the guilt phase of trial 'in that the issue is confined to sanity and the burden is upon the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense' [citation].  As in the determination of guilt, the verdict of the jury must be unanimous." (*Id.* at p. 521.)

### B.  *Admission of Dr. Wilkinson's Testimony*

Wolke first argues that the trial court erred by admitting the testimony of Dr. Wilkinson.  " 'A person is qualified to testify as an expert if he has

special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) ' "We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. [Citation.] Such abuse of discretion will be found only where ' "the evidence shows that a witness *clearly lacks* qualification as an expert . . . ." ' " ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 445.) "When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony." (*People v. Jones* (2013) 57 Cal.4th 899, 949–950.)

Wolke contends the trial court should have excluded Dr. Wilkinson's testimony because he was not a reliable witness. Wolke points out that medical licensing statutes and decisional law establish that a physician's use of alcohol relates to the physician's fitness to practice medicine and convictions involving alcohol consumption can support discipline of the physician by the Medical Board. (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 768, 770 [finding constitutional Bus. & Prof. Code, § 2239, subd. (a), which makes one alcohol-related felony or two alcohol-related misdemeanor convictions conclusive proof of unprofessional conduct by a physician].) Wolke observes that Dr. Wilkinson was on probation when he evaluated Wolke. Wolke then argues that the Medical Board deemed Dr. Wilkinson's professional judgment to be unreliable when it revoked his license and stayed the revocation during the probationary period.

Wolke's argument is insufficient to show that the trial court erred in admitting Dr. Wilkinson's testimony. Preliminarily, there is no need for a

19

witness to hold a medical license or be fit to practice medicine in order to testify as a medical expert. One may testify as an expert in medical matters even without holding a medical degree at all. "[I]t cannot be said as a matter of law that an individual is not qualified to give a medical opinion just because that person is not a licensed physician." (*People v. Villarreal* (1985) 173 Cal.App.3d 1136, 1142, disapproved of on other grounds by *In re Cabrera* (2023) 14 Cal.5th 476, 492; *People v. Catlin* (2001) 26 Cal.4th 81, 131.) *Villareal* held a trial court erred when it ruled that a witness who had completed medical school and was undergoing his internship could not give a medical opinion because he was not licensed. (*Villareal*, at p. 1142.) *Catlin* held that "[q]ualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion." (*Catlin*, at p. 131.) *Catlin* therefore found no error in allowing a witness to give an opinion regarding cause of death, the effects of hypertension, and the time at which someone would have ingested a substance that produced certain symptoms, even though the witness was not a medical doctor or trained in pathology. (*Ibid.*) The key question, when a trial court must decide whether a witness can testify as an expert, is whether the witness "has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) There was sufficient evidence that Dr. Wilkinson had such knowledge and experience, given that he had worked as a forensic psychiatrist for over 40 years.[3]

---

[3] The trial court prevented the prosecution from eliciting testimony from Dr. Wilkinson regarding his follow-up review of records because Dr. Wilkinson had surrendered his license at that point. Wolke, of course, does not argue this was error, nor do the People, so we need not decide whether this ruling was correct.

In any event, contrary to Wolke's argument, the Medical Board did not deem Dr. Wilkinson's professional judgment to be unreliable at the time that he evaluated Wolke. It did not prohibit Dr. Wilkinson from practicing medicine. Rather, it allowed him to continue practicing medicine by staying the revocation of his license, albeit subject to the probation conditions. The fact that the Medical Board allowed Dr. Wilkinson to continue practicing medicine indicates that it did not view his judgment as wholly unreliable. Dr. Wilkinson's probationary license therefore did not make him unreliable as a witness as a matter of law or mean that the trial court abused its discretion in admitting his expert testimony.

This is not to say that Dr. Wilkinson's probationary license was irrelevant. Given that the Legislature and the Medical Board have concluded that alcohol-related convictions are sufficiently connected to professional judgment to support discipline, Wolke could reasonably argue that Dr. Wilkinson's probationary license was relevant to his credibility. (Evid. Code, § 210 [relevant evidence includes evidence "relevant to the credibility of a witness"].) But the trial court allowed Wolke to present evidence of Dr. Wilkinson's license, and both Wolke and the prosecution did so. That evidence just went to the weight of his testimony, not its admissibility. (*People v. Jones, supra*, 57 Cal.4th at pp. 949–950.)

Wolke further argues that Dr. Wilkinson was in violation of his Medical Board probation because he failed to notify the court of his probationary license when the court appointed him to evaluate Wolke. He points to the provision in the stipulated disciplinary order that obligated him to provide a copy of the stipulated disciplinary order to "every hospital where privileges or membership are extended to [him], at any other facility where [he] engages in the practice of medicine," and to his malpractice insurance carriers. Wolke

21

characterizes Dr. Wilkinson's failure to do so as dishonesty warranting exclusion of his testimony as fundamentally unreliable. Wilkinson cites to cases establishing that intentional dishonesty can support a finding of unfitness to practice medicine (e.g., *Matanky v. Board of Medical Examiners* (1978) 79 Cal.App.3d 293, 305) and to *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772, which held that the trial court must act as a gatekeeper to exclude " 'clearly invalid and unreliable' " expert testimony.

As the trial court ruled, the trial court was not a "facility" where Dr. Wilkinson practiced medicine, so the terms of the Medical Board's stipulated disciplinary order did not require notice. Wolke asserts as a fallback that Dr. Wilkinson did not give notice to the facility where he evaluated Wolke, but he fails to support that assertion with evidence in the record. Even if Dr. Wilkinson had failed to notify the facility where he evaluated Wolke, however, it would again go to the weight of his testimony and not require it to be excluded, given that a license is not required to testify as an expert. (*People v. Jones*, *supra*, 57 Cal.4th at pp. 949–950.) The credibility questions arising from Dr. Wilkinson's probationary license issues were not so significant that the trial court abused its discretion in declining to exclude his testimony as a gatekeeping measure.

Finally, even if the trial court did err in admitting Dr. Wilkinson's testimony, such error was harmless. " '[T]he erroneous admission of expert testimony only warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Pearson*, *supra*, 56 Cal.4th at p. 446.) Wolke had the burden of proof in the sanity phase of the trial. (*People v. Hernandez*, *supra*, 22 Cal.4th at p. 521.) There was no shortage of expert

opinion at the trial. Four mental health professionals testified in the sanity phase of trial, Drs. Berke and Kline for Wolke and Drs. Wilkinson and Coles for the prosecution. In addition, the parties stipulated that the jury could consider evidence from the guilt phase, during which Wolke presented testimony from a fifth mental health professional, Dr. Gould.

The jury's verdict indicates that it did not find Wolke's experts persuasive. The jury could have viewed Dr. Berke as lacking credibility because of the numerous inaccuracies and unfounded statements in his report, including referring to Wolke by the wrong name (suggesting Dr. Berke recycled his report about Wolke from a report about someone else), describing Wolke's symptoms in 2018 as " 'flagrant' " when in fact they had improved, and calling Wolke's behavior in Anderson's home "paranoid" when there was no evidence of paranoia. Wolke also told Dr. Coles that he had a lot of misunderstandings with Dr. Berke. Wolke's other expert, Dr. Kline, disregarded Wolke's statement about not attacking a man or couple and, unusually, directly addressed the jury and told them not to consider it. The People argued in closing that this testimony and Dr. Kline's personal address to the jury suggested he was not neutral and his position was "highly suspect." Because the trial court precluded Dr. Wilkinson from testifying about his evaluations of Wolke's experts, excluding his testimony would not have done anything to help with Wolke's experts' credibility issues.

Dr. Wilkinson's testimony was also largely cumulative to that of the prosecution's other expert, Dr. Coles. There were only two unique aspects of Dr. Wilkinson's testimony, neither of which was particularly strong in the overall mix of the evidence. First, Dr. Wilkinson asserted that Wolke's failure to remember what happened in the basement suggested he was editing his story. However, Dr. Wilkinson conceded on cross-examination

23

that he omitted this "editing" assessment from his report because he lacked sufficient data for it.

Second, Dr. Wilkinson characterized as a "justification" Wolke's statement that he killed Anderson to join the one percent, who were also killing people to harvest their stem cells. This was helpful to the People, since it helped negate Wolke's claim that his psychosis prevented him from appreciating the wrongfulness of his actions. But Dr. Coles pointed out that Wolke's statement about the one percent killing people was not itself a moral rationale for killing Anderson. Even without Dr. Wilkinson's testimony, then, the prosecution could have made a similar argument about Wolke's delusion not meaning his actions were moral. The prosecution also repeatedly emphasized that Wolke's statement about not attacking a man or a couple was critically important, which Dr. Wilkinson did not address. Given the other testimony on the question of sanity, even if the trial court had excluded Dr. Wilkinson's testimony, it is not reasonably probable the jury would have found Wolke carried his burden of proving he was legally insane.

## C.    *Substantial Evidence of Sanity*

" 'Under California's statutory scheme, "[p]ersons who are mentally incapacitated" are deemed unable to commit a crime as a matter of law. (§ 26, par. [2].) Mental incapacity under section 26 is determined by the *M'Naghten*[4] test for legal insanity provided in section 25, subdivision (b). [Citations.] Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed.' " (*People v. Powell* (2018) 5 Cal.5th 921, 955.) The ability to distinguish right from wrong

---

[4] *M'Naghten's Case* (1943) 8 Eng.Rep. 718.

encompasses both legal and moral wrong; "a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*People v. Skinner* (1985) 39 Cal.3d 765, 783.)

"[A] jury's finding of sanity will be affirmed if it is supported by evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant sane by a preponderance of the evidence." (*People v. Powell, supra,* 5 Cal.5th at p. 957.) "In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 712.) " 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Id.* at pp. 712–713.)

Wolke points to several weaknesses in the evidence that he contends make the evidence insufficient to support the jury's sanity finding. He first notes that all of the experts' interviews took place months or years after the offense and argues this makes them somewhat speculative. He also notes that his own expert, Dr. Kline, interviewed Wolke closest in time to the offense, five months afterwards. It is true that delays between a crime and an evaluation can make an expert's analysis less persuasive. (*People v. Skinner* (1986) 185 Cal.App.3d 1050, 1060 [interviews three and six months after crime could be considered "somewhat speculative"].) However, even Dr.

Kline's interview came long enough after the offense to be considered speculative under this principle, and Wolke's other experts examined Wolke even later, so his argument is somewhat self-defeating. More importantly, all experts except Dr. Wilkinson testified that they considered each other's evaluations of Wolke, and Wolke's accounts to each expert were identical in most respects, so it is not as though any expert's opinion was based on different facts. To the extent that the delay between the offense and the experts' evaluations of Wolke detracts from the weight of those experts' testimony, the delays do not make those experts' conclusions insufficient to support the jury's verdict.

Wolke also dismisses as speculative Dr. Wilkinson's opinion that Wolke was editing his account by claiming not to remember what happened in the basement. But as noted *ante*, Dr. Wilkinson conceded on cross-examination that his opinion that Wolke was editing was "clinical speculation" and lacked sufficient data to support it, so it is unlikely to have played much of a role, if any, in the jury's decision.

Wolke next dismisses his own statement to the private defender investigator about what he would have done if he had found a couple or a man in Anderson's bedroom. The question in the sanity phase was the extent to which Wolke's delusions and auditory hallucinations drove his behavior and prevented him from understanding the nature of his actions or appreciating the wrongfulness of his actions. Wolke's statement, while describing a hypothetical situation some time after the offense, revealed his own motivations and perceptions and was directly relevant. The jury could reasonably rely on Wolke's statement to the investigator as a demonstration of how much he understood the nature of his actions and was able to restrain himself. The fact that Wolke said he would have pleaded with a man or a

couple not to have him arrested, rather than attacking them, also indicates that he was aware of the legal wrongfulness of his conduct in entering Anderson's house to steal food. The jury could infer that Wolke would have also been aware of the legal wrongfulness of killing Anderson, too.

Wolke next notes that his history of mental illness was incontestable and that the experts all agreed that he was psychotic and had some sort of schizophrenic disorder. This is true but not decisive. "Mental illness is a medical diagnosis; it alone does not necessarily establish legal insanity." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) The legal standard for sanity is much narrower and more specific, turning on whether Wolke understood the nature and quality of his act and whether he understood his action was morally or legally wrong. (*People v. Skinner*, *supra*, 39 Cal.3d at pp. 781–784.)

Wolke faults both Dr. Wilkinson and Dr. Coles with conflating the moral and legal wrongfulness components of this standard. Wolke's argument as to Dr. Wilkinson rests on the beginning of his report, where Dr. Wilkinson said his goal was to evaluate Wolke to determine if he was incapable of " 'distinguishing right from wrong at the time of the commission of the offense.' " This statement does not separate moral from legal wrongfulness, but as Dr. Wilkinson explained in his testimony, this portion of his report was quoting from the order appointing him. It is also consistent with the summary in some judicial opinions, such as our Supreme Court's opinion in *People v. Powell*, *supra*, 5 Cal.5th at page 955. Dr. Wilkinson also later addressed the moral and legal aspects of the standard separately in the conclusion to his report.

Wolke's argument is also not well taken because the concepts of legal and moral wrongfulness are not completely separate, as Wolke himself notes.

27

" '[I]n most instances legal wrongfulness and moral wrongfulness are equivalent.' [Citation.] As Justice Cardozo explained a century ago, ' "knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong." ' " (*People v. Leeds* (2015) 240 Cal.App.4th 822, 831.) Dr. Coles's testimony that Wolke challenges is consistent with the permissible inference that one who understands that an act is legally wrong usually understands that the act is also morally wrong. (*Ibid.*) Dr. Coles opined that Wolke was "firmly grounded in consensual moralities, moral understanding." He explained that Wolke's hallucinations were not so strong as to override other factors in his mind, particularly the legal question of whether he would get caught. Dr. Coles cannot be said to have misconstrued the governing standard for legal insanity.

Properly understood, Wolke's quarrel with Dr. Coles is not with his understanding of the standard but his conclusion that Wolke appreciated the moral wrongfulness of his actions. Wolke asserts that he believed his action was morally sanctioned because his auditory hallucination urged him to join the one percent, he thought he had to kill Anderson to do so, and belonging to the one percent is morally acceptable. This argument lies at the crux of the dispute the jury was asked to solve. No expert seriously disputed that Wolke had a hallucination of a voice urging him to join the one percent and had the delusions that killing Anderson was necessary to join the one percent, and that the one percent killed people and used their bodies in some fashion to

28

remain young. But that hallucination and those delusions do not answer the question of how Wolke viewed Anderson's killing. Wolke could have believed that the one percent's actions of killing people and harvesting their stem cells were good, so that it was morally correct for him also to kill Anderson in order to join the one percent. This would be the type of insane delusion referred to in *People v. Leeds*, *supra*, 240 Cal.App.4th at page 831, akin to a vision of God ordaining the commission of the crime. But Wolke also could have viewed the one percent's activities of killing people to harvest their stem cells as immoral but still chosen to imitate them by killing Anderson, making a Faustian bargain that he would commit an immoral act to reap the benefits of joining the one percent and becoming rich and staying young.

From the evidence and expert testimony before it, the jury could reasonably draw the latter conclusion or, more accurately, conclude that Wolke's evidence failed to convince it to draw the former. Wolke's statement to Daniel B. that he was a "bad man" and "going to jail" for killing Anderson, even though those statements post-dated the offense by some hours, are direct evidence of his knowledge of moral and legal wrongfulness. Wolke's choice to eat the cookies earlier in his trip to California, despite the voices urging him not to, further suggests that he was making choices and not simply following the voices' directives. The words the voices used, telling him not to " 'bitch out [and] to just do it,' " themselves suggest Wolke viewed the voices as telling him to push past his moral hesitancy and commit an act he knew to be wrong. The jury could have agreed with Dr. Coles that Wolke's auditory hallucinations were not so strong as to suggest he was operating based on a different set of morals. It could have also agreed with him that Wolke was aware of the legal consequences—and therefore the moral consequences—based on his statements about sinning by stealing and that he

would have pleaded with a couple or man not to have him arrested.  Wolke's statement to Dr. Wilkinson that his neighbors and friends would think it wrong to murder someone further suggests he did not view the killing as legally wrongful but nonetheless morally correct.  The jury could have also regarded Wolke's follow-up statement, that he did not think the killing was wrong because so many powerful people were doing it, as a rationalization or justification for committing a bad act.

This is not to say that there was no evidence on the other side.  Wolke did tell Dr. Gould that he thought that other people would approve of him killing Anderson because he thought the one percent was killing people and eating them and their stem cells to stay young.  There was also extensive evidence of Wolke's history of mental illness and persistent delusions and hallucinations spanning many years.  But even if the evidence "might also reasonably be reconciled with a contrary finding' " of insanity, that is not sufficient to require reversal of the jury's sanity finding.  (*People v. Westerfield*, *supra*, 6 Cal.5th at p. 713.)

### III.  DISPOSITION

The judgment is affirmed.


BROWN, P. J.

WE CONCUR:

GOLDMAN, J.
SIMONDS, J.*

---

* Judge of the Sonoma County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.